IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
                              )
S.M. and G.M., individually and )
on behalf of their minor child, )
Z.M.,                           )
                              )
              Plaintiffs,     )
                              )
        vs.                   )    Civ. No. 10-00524 ACK-BMK
                              )
STATE OF HAWAIʻI, DEPARTMENT OF )
EDUCATION, et al.,            )
                              )
              Defendants.     )
                              )
```

**ORDER AFFIRMING THE FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
DECISION OF THE OFFICE OF ADMINISTRATIVE HEARINGS**

**I. BACKGROUND**

This case is a civil action for the review of a
decision of the State of Hawaiʻi's Office of Administrative
Hearings.  (See Admin. R. Ex. 10 ("Admin. Decision").)
Plaintiffs are Z.M. ("Student") and her parents.  Defendants are
the State of Hawaiʻi's Department of Education and Kathryn
Matayoshi, in her official capacity as superintendent of the
department.[1]  The Court has jurisdiction under 20 U.S.C.
§ 1415(i) and affirms.

_____

[1] Matayoshi was the acting and interim superintendent on
the date that this action was filed, September 10, 2010.  She was
appointed as superintendent effective September 13, 2010.  See
Meet the Superintendent, http://doe.k12.hi.us/about/
meet_kmatayoshi.htm.

Student is currently six years old and was diagnosed with autism in August 2007. (See Admin. R. Resp't's Ex. 5 ("Feb. IEP") at 1-2.) Student and her family moved to Hawaiʻi from New Jersey in November 2009. (Admin. Decision at 3 ¶¶ 2, 9.) At that time, Student enrolled in a private autism center in Honolulu and her parents began discussions with Defendants concerning plans to have Student enroll in public school. (Id. ¶¶ 10-11.)

An individualized education program ("IEP") for Student was developed in February 2010. In a due process hearing before the Office of Administrative Hearings, Plaintiffs claimed that the February IEP was flawed, particularly in comparison with a subsequent IEP that was developed for Student in March 2010. (See Admin. R. Resp't's Ex. 6 ("Mar. IEP").) The administrative hearings officer dismissed Plaintiffs' claims after determining that the February IEP was an offer of a free appropriate public education under the Individuals with Disabilities Education Act ("IDEA"). (See Admin. Decision at 19.)

The factual background is set forth in greater detail in the administrative hearings officer's decision. (See Admin. Decision at 3-10.) The parties have not challenged the officer's factual findings, and the Court adopts them to the extent that

they are relevant to this case.[2/]  The Court will describe the
pertinent details of the IEPs at issue in the discussion below.

## II. STANDARD

In evaluating an appeal of an administrative decision
under the IDEA, a court "(i) shall receive the records of the
administrative proceedings; (ii) shall hear additional evidence
at the request of a party; and (iii) basing its decision on the
preponderance of the evidence, shall grant such relief as the
court determines is appropriate."[3/]  20 U.S.C. § 1415(i)(2)(C).[4/]

The statutory requirement "that a reviewing court base
its decision on the 'preponderance of the evidence' is by no
means an invitation to the courts to substitute their own notions
of sound educational policy for those of the school authorities
which they review."  Bd. of Educ. v. Rowley, 458 U.S. 176, 206

---

[2/] Some of the factual matters that were addressed at the
hearing before the Court are irrelevant to the issues raised in
this case.  For example, Student's parents repeatedly arranged
for Student to begin attending public school, only to change
their minds at the last minute without informing the school.
This behavior was discourteous, but it has no bearing on whether
the February IEP was deficient.  Likewise, the breakdown of the
parties' settlement efforts, which occurred several months after
February, is irrelevant to the sufficiency of the February IEP.

[3/] No party has requested that the Court hear additional
evidence in this action.

[4/] An amendment to the IDEA, effective July 1, 2005,
affected the subsection number at which this provision appears in
the statute but did not affect the text of the provision.
Compare 20 U.S.C. § 1415(i)(2)(B) (in effect prior to July 1,
2005) with 20 U.S.C. § 1415(i)(2)(C) (effective July 1, 2005).

(1982). Rather, "due weight" must be given to the findings in the administrative proceedings. Id.

The amount of deference given to administrative findings in this context is a matter of judicial discretion. See Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)). A court must "consider the findings 'carefully and endeavor to respond to the hearing officer's resolution of each material issue,' but 'is free to accept or reject the findings in part or in whole.'" Id. (quoting Gregory K., 811 F.2d at 1311). "When exercising its discretion to determine what weight to give the hearing officer's findings," a court may "examine the thoroughness of those findings" and accord greater deference when they are "'thorough and careful.'" Id. (quoting Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994)).

A court's inquiry in reviewing administrative decisions under the IDEA is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Rowley, 458 U.S. at 206-207

(footnotes omitted); see also <u>Smith</u>, 15 F.3d at 1524.

### III. DISCUSSION

This case largely concerns the substance of the February IEP. At the hearing before the Court, Plaintiffs noted that one of the issues that they have raised can also be interpreted as procedural. The Court will review the issues raised by Plaintiffs in roughly the order presented in their brief.

The Court finds that the administrative hearings officer's findings of fact and conclusions of law are "thorough and careful," and so accords them significant deference. <u>Capistrano</u>, 59 F.3d at 891. The Court concludes that Defendants complied with the procedural requirements of the Act. The Court also concludes that the February IEP was reasonably calculated to enable Student to receive educational benefits. The Court therefore affirms.

### A.   Qualifications of the One-on-One Support Provider

The February IEP provided for Student to receive 1875 minutes per week of special education for the first few months and 1830 minutes per week thereafter. (Feb. IEP at 15.) The additional 45 minutes per week at the beginning of the program were intended "to assist [Student] in her transition to [public] school." <u>Id.</u> In addition, the February IEP provided for 720 minutes per quarter of speech and language therapy and 270

minutes per quarter of occupational therapy. (Id.) Plaintiffs have not challenged the sufficiency of any of these services.

The February IEP also provided for Student to receive one-on-one support from an adult for 1875 minutes per week for the first few months and 1830 minutes per week thereafter.[5] (Feb. IEP at 15.) In other words, the February IEP provided for slightly more than full-time special education services for Student. And it provided that Student would always be with at least two adults: the one-on-one support provider plus whatever teachers or staff members were leading Student's activities.

Plaintiffs' first issue is that the February IEP did not specify the qualifications and training that the one-on-one support provider would have.[6] (See Pls.' Br. at 3-4.) In its evaluation of this issue, the administrative hearings officer cited two portions of the Hawaiʻi Administrative Rules that

---

[5] On its face, the February IEP provides for 1845 minutes of one-on-one support in the first few months, not 1875 minutes. (Feb. IEP at 15.) The administrative hearings officer found that the provision for 1845 minutes was a typographical error. (Admin. Decision at 6 ¶ 30.) The actual plan, according to the officer, was to provide 1875 minutes of one-to-one support, matching the 1875 minutes of special education. (Id.) The parties have not addressed the thirty-minute discrepancy, but the officer's finding is supported by other documents in the record. For example, the "Prior Written Notice of Department Action" that was issued after the meeting reflects 1875 minutes of both special education and one-on-one support for the first few months. (See Admin. R. Resp't's Ex. 5 at ZM 71.)

[6] Plaintiffs' concern about whether an autism consultant teacher would provide supervision and support to the one-on-one support provider is addressed in the next section.

specify what an IEP must contain.  See Haw. Code R.

§ 8-60-44(a)(4), (7).[7/]  The officer noted that the rules do not

require an IEP to specify the qualifications and training that

service providers should have.  (Admin. Decision at 12–14.)  The

officer therefore concluded that the February IEP was not

deficient for lacking these specifications.  (Id. at 13.)

Section 8-60-44(a) also states that "[n]othing in this

section shall be construed to require . . . [t]hat additional

information be included in a student's IEP beyond what is

explicitly required in [28 U.S.C. § 1414]."[8/]  Haw. Code R. § 8-

60-44(d)(1).  The requirements for the contents of IEPs are set

_____

[7/] The regulations provide that an IEP shall include a "statement of the special education and related services and supplementary aids and services . . . to be provided to the student . . . and a statement of the program modifications or supports for school personnel that will be provided."  Haw. Code R. § 8-60-44(a)(4).  They also require the IEP to specify the "projected date for the beginning of the services and modifications described . . . , and the anticipated frequency, location, and duration of those services and modifications."  Id. § 8-60-44(a)(7).

As will be discussed in the next section, the March IEP specifies that an autism consultant teacher will provide consultation for the one-on-one support provider and other teachers.  This consultation appears to fall within the description of "supports for school personnel" in section 8-60-44(a)(4).  But the consultation was added to the IEP in response to Plaintiffs' disclosure of Student's behavioral problems, which did not occur until March.  There was no need for the consultation to be described in February.

[8/] Section 8-60-44 refers to "section 614 of the Act" rather than to 28 U.S.C. § 1414.  Haw. Code R. § 8-60-44(d)(1).  The term "the Act" refers to the IDEA.  See id. § 8-60-2.  Section 614 of the IDEA is codified at 28 U.S.C. § 1414.

forth at length in 28 U.S.C. § 1414(d).  Nothing in that section indicates that an IEP must specify the qualifications or training of service providers.

The Court therefore affirms the administrative hearings officer's conclusion.  See B.V. v. Dep't of Educ., State of Hawaii, 451 F. Supp. 2d 1113, 1125 (D. Haw. 2005) ("[Student's] IEP was not deficient simply because it failed to prescribe specific qualifications for [Student's] Skills Trainer."), aff'd, 514 F.3d 1384 (9th Cir. 2008).

**B.        Modifications to the IEP Based on New Information**

Two of the issues that Plaintiffs raise involve similar analysis, so the Court will address them together.  The March IEP included a transition plan and services from an autism consultant teacher.  (Mar. IEP at 16-17; Admin. R. Resp't's Ex. 6 at 104-05.)  The February IEP did not.  Plaintiffs argue that the lack of these items in the February IEP, coupled with their presence in the March IEP, shows that the February IEP was deficient.

But Plaintiffs fail to address the administrative hearings officer's analysis, which the Court affirms.  Both items were added to the March IEP based on information that Plaintiffs possessed by January yet failed to disclose until March.  Plaintiffs' failure to timely disclose important information does not render the February IEP deficient.

###### 1.        Autism Consultant Teacher Services

First, Plaintiffs complain that the February IEP did not provide for autism consultant teacher ("ACT") services.  They raise both substantive and procedural arguments.

###### a.        Substantive Concerns

According to the administrative hearings officer, the reason that the February IEP did not provide for ACT services was that Defendants were not aware in February that Student had behavioral problems requiring those services.[9/]  (Admin. Decision at 5 ¶ 26.)  Student's behavioral problems include "dropping to the floor when instructed to do a task or when Student wanted something; self-injurious behavior, including head banging; and tantrumming, including crying, whining, [and] kicking and hitting others."  (Id. at 4 § 17.)  The officer noted that when Student's parents "finally disclosed" information about Student's behavioral problems "just prior to the March 30, 2010 IEP meeting, the IEP team . . . amended the IEP to include ACT services to assist with Student's behaviors and transitioning."  (Id. at 13.)[10/]

---

[9/] Plaintiffs have not argued that ACT services should be provided for all students with autism, no matter whether they have behavioral problems.  The Court therefore defers to the administrative hearings officer's implicit finding that ACT services are not necessary unless students have behavioral problems.  (Cf. Admin. Decision at 8 ¶ 48; id. at 12–14.)

[10/]   This amendment was in keeping with Defendants' duties

(continued...)

The information that Student's parents failed to disclose includes, at least, several documents that the private center prepared.  (Admin. R. Pet'r's Ex. 2.)  First, on September 9, 2006, the center conducted an "intake assessment," which described several of Student's problems.  (Admin. Decision at 3 ¶¶ 5-8.)[11]  Second, "Student exhibited behavioral problems that were documented in . . . progress reports."  (Id. at 4 ¶ 13.) Third, in January 2010 the center developed a "behavioral intervention plan" that further described Student's behavioral problems.  (Id. at 4 ¶ 17.)  These documents were not disclosed to Defendants until late March 2010, just before the development of the March IEP and well after the development of the February IEP.  (Id. at 3-4 ¶¶ 12, 18.)

"[B]efore they can fairly argue that the best the school authorities had to offer was or is not good enough, the

[10] (...continued)
under the IDEA.  See 20 U.S.C. § 1414(d)(4)(A)(ii)(III) ("The local educational agency shall ensure that . . . the IEP Team . . . revises the IEP as appropriate to address . . . information about the child provided to, or by, the parents . . . ."); id. § 1414(d)(3)(B)(i) ("The IEP Team shall . . . in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior . . . .").

[11] The intake assessment also recommended teaching Student "behavioral, language and social skills" using a methodology called "applied behavior analysis" or "ABA."  The Court addresses Plaintiffs' arguments concerning ABA below.  See infra Part III.C.

critical pre-requisite is that the parents must have cooperated with the school authorities . . . to try to develop the IEP." S.M. v. Weast, 240 F. Supp. 2d 426, 436 (D. Md. 2003). Student's parents, for whatever reason, failed to disclose important information. This failure led to the omission of ACT services from the February IEP. See id. at 437 ("The parents . . . held back critical data they had in hand, some of which might well have been incorporated in the IEP.").

The administrative hearings officer concluded that "because Student's behavioral problems were not disclosed at the time the February 9, 2010, IEP was developed, the absence of ACT services is not a denial" of a free appropriate public education. (Id. at 13-14.) The Court affirms this determination. See Robert M. v. Hawaii, Civ. No. 07-00432 HG-LEK, 2008 WL 5272779, at *15 (D. Haw. Dec. 19, 2008) ("Parents of a student qualified for services under the IDEA may not withhold critical information from the IEP team, and then claim a [free appropriate public education] was not provided.")

### b.      Procedural Concerns

At the February IEP meeting, in addressing Student's parents' concerns about the one-on-one support provider, the autism consultant teacher committed to being at Student's school every day during the first week of Student's enrollment. (3 Tr. at 520.) She also indicated that she would likely spend about

thirty hours working with Student (or Student's other service providers) in the first month that Student attended public school. (Id.)  Neither of these statements were reflected in the February IEP.

Plaintiffs claim that omitting these promises from the February IEP violated the procedural requirements for the development of IEPs.  See, e.g., 20 U.S.C. § 1414(d)(3)(A)(ii) ("In developing each child's IEP, the IEP Team . . . shall consider . . . the concerns of the parents for enhancing the education of their child."); Honig v. Doe, 484 U.S. 305, 311 (1988) (referring to the IDEA's "procedural safeguards that guarantee parents . . . an opportunity for meaningful input into all decisions affecting their child's education.").  Plaintiffs argued at the hearing before the Court that they were led to believe that the promises would be formalized in the February IEP.  They also argued that they would have demanded that the February IEP specifically provide for ACT services had they understood the promises to be informal.

The administrative hearings officer concluded that the promises were informal and were not intended to have been incorporated into the February IEP.  (Admin. Decision at 12-13.) The officer further concluded that there was no need for the promises to have been incorporated into the February IEP because Defendants were not aware of Student's behavioral problems.

-12-

(Id.); see also supra Part III.B.1.a (affirming this
determination).

"Not every procedural violation . . . is sufficient to
support a finding that the child in question was denied a [free
appropriate public education]." Amanda J. ex rel. Annette J. v.
Clark Cnty. Sch. Dist., 267 F.3d 877, 892 (9th Cir. 2001).
"[P]rocedural inadequacies that result in the loss of educational
opportunity, or seriously infringe the parents' opportunity to
participate in the IEP formulation process, or that caused a
deprivation of educational benefits . . . result in the denial of
a [free appropriate public education]." Id. (citations and
internal quotation marks omitted).

In this case, even if there was a procedural violation,
there was no "loss of educational opportunity" or "deprivation of
educational benefits." Id. As described above, there was no
need for the February IEP to include ACT services because
Student's behavioral problems had not yet been disclosed when
that IEP was developed. Moreover, Plaintiffs have not shown (or
even suggested) that the autism consultant teacher would not have
fulfilled her promise if Student had enrolled in public school.

Additionally, nothing "seriously infringe[d] the
parents' opportunity to participate in the IEP formulation
process." Amanda J., 267 F.3d at 892. In Amanda J., the court
held that the parents had been denied an opportunity to fully and

-13-

effectively participate in the development of an IEP. <u>See</u> <u>id.</u> at 893 ("[T]he District had information in its records, which, if disclosed, would have changed the educational approach used for Amanda."). The roles in this case are the reverse of those in <u>Amanda J.</u> Here, Student's parents failed to disclose information they had in their records. Plaintiffs cannot hold Defendants responsible for Plaintiffs' own failures to provide important information to Defendants.

The Court does not believe that the omission of the autism consultant teacher's promises from the February IEP was a violation of the IDEA's procedural requirements. But even assuming that there was a violation, it was not so severe as to be a denial of a free appropriate public education. <u>See</u> <u>Amanda</u> <u>J.</u>, 267 F.3d at 892. The Court therefore affirms the determination that the promises need not have been specified in the February IEP.

## 2.      <u>Transition Plan</u>

Plaintiffs also claim that Defendants "made no attempt" to address Student's difficulty with transitions in developing the February IEP. (Pls.' Br. at 9–10.) And they note that in contrast, the March IEP included a "strong transition plan." (<u>Id.</u> at 10 (citing Admin. R. Resp't's Ex. 16).) Plaintiffs assert that "[p]erhaps, if [Defendants] involved the child's service providers earlier, the IEP could have address[ed] this

-14-

concern earlier." (Id.)[12/]

Plaintiffs aver that "[i]t was clear from the audio
tape that the parent stated that transitioning without a trained
skills trainer would be very difficult for Student." (Pls.' Br.
at 9.) They repeated this claim at the hearing before the Court.
But the Court has listened to the entire recording of the
February IEP conference, and no great concern with Student's
ability to make transitions is apparent in that recording.

Indeed, at around the 1:14:00 mark of the recording,
Student's father indicates that he expects that Student will
handle the transition well, and that she made the transition from
New Jersey to Hawaiʻi without difficulty.[13/] The recording
therefore undermines Plaintiffs' claim. But it is consistent
with the administrative hearings officer's factual findings that
Student's parents did not inform Defendants that they anticipated
any difficulties with transition. (Admin. Decision at 4-7 ¶¶ 15,

---

[12/] The record belies Plaintiffs' claim that Defendants
failed to "involve[] the child's service providers." There are
several examples of Defendants' attempts to involve the private
center and obtain as much information as possible about Student.
(See, e.g., Admin. R. Resp't's Ex. 19 at ZM 182, 188, 189, 190,
192-93.) Defendants' efforts appear in at least some instances
to have been rebuffed or ignored.

[13/] The audio recording indicates that Student's parents were
concerned with the qualifications of the one-on-one support
provider, who had not yet been identified. But as discussed
above, the IEP was not required to specify the qualifications
that the one-on-one support provider would have. See supra Part
III.A.

27, 36.)[14]

The administrative hearings officer stated that "it is not expected that [Defendants] address Student's behavioral and other needs if those needs are not known, not disclosed, and the information and reports are not shared prior to the development of the IEP." (Admin. Decision at 14–15.) The officer also stated that "if parents do not share the information they have about Student's behavioral and other needs, they can not expect that their complaints that [Defendants] did not provide an adequate transfer plan . . . will be deemed meritorious." (Id. at 15.) The officer concluded that Plaintiffs had failed to show that the February IEP's provisions for the transition were inadequate. (Id. at 14–15.)

The Court affirms the officer's ruling, which Plaintiffs have failed to address in their brief. See Robert M., 2008 WL 5272779 at *15; S.M., 240 F. Supp. 2d at 436–37.

C.      **Methodology**

The February IEP contains a section that describes the services that will be provided to Student. (See Feb. IEP at 15–16.) This section does not specify the use of a methodology

---

[14] The administrative hearings officer also relied on Student's father's statements in a December meeting that Student was "'a real trooper,'" had "transitioned from New Jersey to Hawai'i without any problems," and was "cooperative and well-behaved and . . . did not have trouble with transition." (Id. at 4 ¶ 15.) Plaintiffs have not denied that Student's father made these statements.

called "applied behavior analysis" or "ABA." Nor does it specify
any other particular methodology by name. (See id.) In
contrast, the March IEP does specify, in a box titled
"Clarification of Services and Supports," that "Strategies
consistent with Applied Behavioral Analysis methodology will be
used . . . ."[15/] (Mar. IEP at 16-17.) Plaintiffs argue that this
change demonstrates that the February IEP was deficient for its
failure to specify Defendants' choice of methodology. (Pls.' Br.
at 8-9.)

       The administrative hearings officer correctly stated
that the "methodologies the DOE employs [are] up to the DOE to
decide." (Admin. Decision at 14.) According to the Supreme
Court, "courts must be careful to avoid imposing their view of
preferable educational methods upon the States." Rowley, 458
U.S. at 207. "The primary responsibility for formulating the
education to be accorded . . . and for choosing the educational
method most suitable to the child's needs, was left by the Act to
state and local educational agencies in cooperation with the
parents or guardian of the child." Id. "Therefore, once a court
determines that the requirements of the Act have been met,
questions of methodology are for resolution by the States." Id.

_____

       [15/] The parties are somewhat inconsistent between referring
to ABA as "applied behavior analysis" and "applied behavioral
analysis." (See, e.g., Pls.' Br. at 8; Defs.' Br. at 3.) It
appears from the Court's brief research that the former term is
more prevalent.

at 208.

Plaintiffs acknowledge that Defendant "is at liberty to choose an appropriate methodology for students." (Pls.' Br. at 8.) But they assert that in this case, Defendant has "ke[pt] this choice a secret." (Id.) According to Plaintiffs, the February IEP's failure to expressly specify a named methodology renders the IEP deficient. At the hearing before the Court, Plaintiffs cited 14 U.S.C. § 1414(d)(1)(A)(i)(IV), which provides that the "special education and related services and supplementary aids and services" in an IEP should be "based on peer-reviewed research to the extent practicable." Without a specifically identified methodology, Plaintiffs argue, they are unable to ensure that whatever methodology the school chooses will be based on peer-reviewed research.

While no methodology is specifically named in the February IEP, Plaintiffs' argument that the IEP's methodology has been kept secret is specious. The February IEP contains nine pages of annual goals accompanied by fairly granular benchmarks and short-term objectives. (Feb. IEP at 6-14.) It also specifies a number of strategies for Student's education. These strategies include seating her away from distractions and loud noises; gaining her attention before instructing; checking for understanding; teaching in small steps with repetition; providing modeling, guided practice, and immediate feedback; providing one-

-18-

on-one adult support; providing visuals or signs to develop communication; alternating physical and sensory breaks with structured activities; providing a visual schedule; and supervising her closely when she is outdoors and when she is learning new physical activities. (Id. at 15.)

The Ninth Circuit recently considered the section of the IDEA that Plaintiffs cite. See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1122 (9th Cir. 2011). The R.P. court stated that "[t]he IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide him with educational benefit." Id. Like the plaintiffs in R.P., Plaintiffs "have introduced no evidence that the methods selected for [Student] . . . were inappropriate under the IDEA." Id.

Plaintiffs have not shown that an IEP for a child with autism can only be sufficient if it expressly specifies that ABA will be employed.[16] The Court therefore affirms the determination in this case that "the methodologies to address

_____

[16] In R.P., the challenged IEP happened to specify the use of ABA, the methodology that Plaintiffs argue should have been expressly specified in the February IEP. See 631 F.3d at 1122. Unlike Plaintiffs, the parents in R.P. apparently opposed the use of ABA. In any event, R.P. underscores the discretion that educators have to choose methodologies. While it involves an IEP that specified the use of ABA, it does not require that all IEPs developed for children with autism include ABA.

Student's needs do not have to be specified in the IEP." (Id.);
see also J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 952 (9th
Cir. 2010) (according "deference to the District's determination
and ALJ's finding that [Student's] teachers needed flexibility in
teaching methodologies because there was not a single methodology
that would always be effective" and concluding that "the District
did not commit a procedural violation of the Individuals with
Disabilities Education Act by not specifying teaching
methodologies in [Student's] individualized educational
programs.").

    The administrative hearings officer went beyond finding
whether the February IEP incorporated a methodology at all.  The
officer concluded that the February IEP actually incorporated
ABA, Plaintiffs' desired methodology.  (See Admin. Decision at 14
("[A]s the special education teacher and [autism consultant
teacher] testified, . . . ABA is incorporated in the supplemental
aids and supports section of the [February] IEP," and was
"included in Student's services throughout the school day.").)

    This conclusion appears to be supported.  The Court
lacks expertise in educational methodologies, and the parties
have provided no description of ABA.  Yet as described above, the
February IEP includes the following directive:  "When
instructing, provide modeling, guided practice, and immediate
feedback."  (Feb. IEP at 16.)  This directive is consistent with

descriptions of ABA on various web sites concerning autism.  <u>See,</u>
<u>e.g.</u>, <u>Austism Teaching Methods: Applied Behavior Analysis and</u>
<u>Verbal Behavior</u>, http://www.autismweb.com/aba.htm.  So are, at
least, the directives to "[t]each in small steps with repetition
for mastery" and to measure Student's progress by "[o]bservation"
and "[r]ecords."  (<u>Id.</u> at 7-10, 14-16.)

        Plaintiffs have not shown error in the officer's
finding that the February IEP incorporated ABA, if not expressly.
So the Court also affirms the determination that "ABA is
incorporated in the supplemental aids and supports section of the
IEP."  (Admin. Decision at 14.)

**D.**        **Placement Description**

        The IEP forms include a section intended to "[e]xplain
the extent, if any, that the student[] will not participate with
students without disabilities in the general education class,
extracurricular activities and other non-academic activities."
(<u>E.g.</u>, Feb. IEP at 17.)  The February IEP stated that Student
would "participate with non-disabled peers at recess and <u>to her</u>
<u>ability</u> in Music, Hawaiiana and P.E."  (<u>Id.</u> (emphasis added).)
It also stated that Student would "participate with non-disabled
peers on select field trips and in school wide activities [such
as] Mayfair, Jogathon and Songfest."  (<u>Id.</u>)  The March IEP
revised this section to include participation in Art and
specified that Student would participate in the designated

-21-

subjects for thirty minutes per class. (Mar. IEP at 18.)

Plaintiffs contend that the phrase "to her ability" in the February IEP was insufficiently defined and left the degree of the student's participation with her non-disabled peers to the discretion of the teachers. (Pls.' Br. at 10–11.) Plaintiffs assert that the law "requires a definitive description of this most important element of the IEP" and that the "required factors were not used to determine the least restrictive placement." (Id.)

The administrative hearings officer found that the phrase "to her ability" means "that it is to Student's ability, not up to the teacher's discretion." (Admin. Decision at 8 ¶ 43.) This finding comports with the testimony that was offered at the administrative hearing. For example, the special education teacher testified that "[i]t was always my intention for Student to participate in music the entire music period," but that "since we didn't know yet how she would respond, we thought . . . we could let her stay if she's participating and enjoying the music, versus saying, 'Her ten minutes is up, let's pull her out because the IEP has ten minutes." (2 Tr. at 355–56.) The special education teacher did not think that the phrase "to her ability" allowed her to keep Student away from a class that Student was capable of attending. (Id.)

Similarly, the autism consultant teacher testified that

"what was discussed in the IEP meeting was that if she could stay for five minutes and attend and participate, then she would stay that long.  If she could stay up to 15 minutes, we would keep with that.  But we didn't want to keep her in longer or shorter than what was appropriate for her."  (3 Tr. at 545.)

The administrative hearings officer concluded that the phrase "to her ability" allows Student "the maximum amount of participation with non-disabled peers she is able to have."  (Id. at 17.)  Interpreted in that way, the February IEP fulfills the statutory goal of the IDEA to ensure the access of children with disabilities to "the general education curriculum in the regular classroom, to the maximum extent possible . . . ."  20 U.S.C. § 1400(c)(5)(A).[17]

Plaintiffs have not shown that the phrase "to her ability" in the February IEP allowed Defendants to prevent Student from participating in the enumerated classes to the maximum extent possible.  Absent any such showing, the program's specification that Student would participate with nondisabled peers "to her ability" was reasonably calculated to enable her to

---

[17] See also 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(1)(2)(i) ("Each public agency must ensure that . . . [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled . . . ."); Haw. Code R. § 8-60-15(1) ("The department shall ensure that . . . [t]o the maximum extent appropriate, students with disabilities . . . are educated with students who are nondisabled . . . .").

receive educational benefits in the least restrictive

environment.  See Rowley, 458 U.S. at 206-07; Sacramento City

Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1404 (9th Cir.

1994).[18/]  The Court therefore affirms the administrative hearings

officer's determination that the placement provision in the

February IEP was appropriate.[19/]

**E.      Furlough Fridays**

Plaintiffs also contend that Defendants failed to

provide a free appropriate public education because the February

IEP included no provision concerning the State of Hawaiʻi's

imposition of furlough days.  (Pls.' Br. at 11-12.)  The

administrative hearings officer concluded that "[b]ecause none of

_____

[18/] Rachel H. sets forth the "standard for determining the
presence of compliance with" 20 U.S.C. § 1412(a)(5), which
mandates education in the least restrictive environment.  See 14
F.3d at 1403-04.  Under Rachel H., courts are to consider "(1)
the educational benefits of placement full-time in a regular
class; (2) the non-academic benefits of such placement; (3) the
effect Rachel had on the teacher and children in the regular
class; and (4) the costs of mainstreaming."  Id. at 1404.
Plaintiffs have not argued that the February IEP failed to comply
with Rowley or Rachel H. if the phrase "to her ability" means
what the administrative hearings officer determined that it
means.

[19/] The Court notes that the March IEP's specific provision
for 30 minutes of participation may, in some instances, result in
less overall participation than the February IEP did.  This might
be the case if, for example, 30 minutes is less than the amount
of participation that Student would have had if participating "to
her ability."  Plaintiffs have not challenged the 30-minute
specification, either in this court or in a due process hearing,
and apparently preferred a specific length of time to the more
flexible specification that Student would participate "to her
ability."

the services in the February 9, 2010 IEP were commenced, Student
did not miss any services due to furlough Fridays." (Admin.
Decision at 17.)  The officer added that "because Student had not
yet attended [public] school, there was no need to develop a
furlough adjustment plan."[20]  (Id.)  The officer therefore
dismissed Plaintiffs' allegation that Defendants' "furlough
Friday policy runs in opposition to the frequency of services
identified in the IEP."  (Id.)

        The Ninth Circuit has determined that "Hawaii's teacher
furloughs and concurrent shut down of public schools is not a
change in the educational placement of disabled children."  N.D.
v. Hawaii Dep't of Educ., 600 F.3d 1104, 1116 (9th Cir. 2010).
The court noted that an "across the board reduction of school
days . . . does not conflict with Congress's intent of protecting
disabled children from being singled out."  Id.  Also, in
response to the N.D. plaintiffs' contention that "the reduction
of the school week constitutes a change in the general
educational program of the student," the court concluded that the

---

        [20] The record and briefs do not appear to include a
definition of the term "furlough adjustment plan," and that term
has not yet appeared in a judicial order.  Another decision from
the Office of Administrative Hearings describes a furlough
adjustment plan as an offer of "available service times to make
up for any services that may have been missed because of
furloughs."  Student v. Dep't of Educ., State of Hawaiʻi, DOE-
SY1011-003, at 19 (Office of Admin. Hearings Dec. 13, 2010)
(findings of fact, conclusions of law and decision), available at
http://doe.k12.hi.us/reports/specialeducation (follow "Due
Process Hearing Decisions" hyperlink).

four-day weeks "created by the furloughs are no different" than four-day weeks "when there are federal and state holidays." Id. at 1117. These four-day weeks therefore "do not constitute changes in [an] educational program." Id.

The Ninth Circuit's opinion in N.D. forecloses any argument that the State of Hawaiʻi's decision to implement furloughs, in general, constituted a denial of a free appropriate public education to Student. Yet the Ninth Circuit did not "leave the parents of disabled children with no means of redress." Id. Rather, the court stated that a "school district's failure to provide the number of minutes and type of education guaranteed in an IEP could support a claim of material failure to implement an IEP." Id.

According to the Ninth Circuit, a "material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP." Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 815 (9th Cir. 2007). Whether a "material failure" occurred depends on a school district's implementation of an individualized education program. See id.

Because Student has never attended public school, Plaintiffs cannot show that Defendants' implementation of the program was a material failure. Defendants had no opportunity to implement the program. Plaintiffs' contention that the

implementation of furlough days will constitute a material failure is speculative.  See <u>N.D. v. Hawaii</u>, Civ. No. 09-00505 DAE-BMK, 2009 WL 3415312, at *2 (D. Haw. Oct. 22, 2009) ("[I]t remains to be seen whether the 17-day cut will amount to a material failure, especially for those students who may be able to receive the same amount of special education and related services required by their IEP in a shortened 4-day week.").  The administrative hearings officer was therefore correct to dismiss the allegation concerning the implementation of furloughs.

**F.**          **Appropriateness of the Private Center**

The administrative hearings officer concluded the decision by discussing the "appropriateness of the current private placement," although he noted that the question need not be decided because Defendants had offered Student a free appropriate public education.  (Admin Dec. at 17-19.)  The officer determined that both the private center and the public school are appropriate placements for Student.  (<u>Id.</u> at 19.)

Both parties have briefed the issue of whether the private center is an appropriate placement.  (Pls.' Br. at 12-14; Defs.' Br. at 37-40.)  But given the resolution of this case, the Court agrees with the officer that the issue need not be addressed.

**IV. CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the

Findings of Fact, Conclusions of Law, and Decision of the State
of Hawai'i's Office of Administrative Hearings.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, April 20, 2011.



Alan C. Kay
Sr. United States District Judge

S.M. and G.M., individually and on behalf of their minor child, Z.M. v. State
of Hawai'i, Department of Education, Civ. No. 10-00524 ACK-BMK: Order
Affirming the Findings of Fact, Conclusions of Law, and Decision of the Office
of Administrative Hearings